The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. We're prepared to begin our argument in our first case, Federal Trade Commission v. Pukke. And Mr. Koslow, when you're ready. Yes, Your Honor. Good morning. May it please the Court. In light of the Supreme Court's decision in AMG Capital Management that the FTC may not seek or obtain monetary relief under Section 13b of the FTC Act, the monetary relief that the District Court granted in two of its orders cannot stand. Those are the orders of March 24th, 2021, awarding the FTC $120.2 million under Section 13b, based on the appellant's alleged deceptive acts and practices, and the order of January 13th, 2021, which sanctioned the defaulting appellants in the same amount, also under Section 13b. Accordingly, Your Honors, as the Ninth Circuit did in AMG itself, and as the Eleventh Circuit did in FTC v. On Point Capital Partners, we're asking this Court to direct the receiver to return the frozen funds and assets to the appellants and to direct the return of their passports, which have been confiscated. The FTC argues that the award can be upheld under two theories. One, Section 19 of the FTC Act, and second, the District Court's inherent contempt power. And I will address each of those in order. Section 19 of the FTC Act does allow for monetary relief if there is a violation of an FTC rule. The FTC argues that the District Court found the appellants violated the Telemarketing Sales Rule, PSR, and they claim that under Civil Rule 54b, there's enough evidence in the record to support a judgment of at least $122.2 million under Section 19. However, the FTC did not plead Section 19 in this case, although it certainly could have, and it has done so in many other cases. Furthermore, the FTC filed a post-judgment motion for leave to amend its complaint to allege claims under Section 19, and the District Court denied that motion. Also, Rule 54b cannot be used if it would substantially prejudice the appellants, and in this case, the appellants had no notice in the District Court that any claim would be made under Section 19 and no opportunity to defend such a claim. The claim-splitting doctrine would not allow the FTC to sue the appellants in the new case under Section 19, so we submit there's no basis for reimagining this case as if it had been brought under Section 19. In any event, the existing record would not support a $120.2 million award based on the alleged violation of the TSR. As we argued in our briefs, the TSR does not apply to sales of property only to goods and services, but even if it did apply to sales of property, and even if it were established that there was a violation in this case, Section 19 authorizes monetary relief only if a violation occurred within three years of suit and only to the extent that the District Court finds necessary to redress the injuries suffered by those The FTC did not put any evidence in the District Court identifying any specific consumer who was injured by the alleged violation of the TSR, nor did the FTC put in any evidence to show the monetary value of such an injury. The District Court, in addition, specifically said that it would not make any findings concerning any compensation owed as a result of the TSR violation. Therefore, and also the only direct evidence, as we showed, of a TSR violation occurred in 2005, which is 13 years beyond the three-year statute of limitations in that section. Are you trying to drag us back into the merits of the AmeriData order? Well, that's the second basis for the FTC's argument is that there's a contempt finding by the District Court for violation of the AmeriData stipulated final judgment presented on May 17, 2006. That's the second argument they make, and we would like to address that as well. In that case, the District Court said that the violation began in 2005, and continued because it was based on misrepresentations that were made by the appellants. What I'm asking you, are you trying to drag us into relitigating the merits of the AmeriData order? No, I'm not, Your Honor. Well, then, what basis do you have? Let's suppose we agree with you on the section 19 point, isn't the contempt judgment very different from the merits of the AmeriData order and not for us? Does the contempt judgment then become a matter of enforcement and of the District Court trying to ensure the integrity of its orders because you did violate the permanent injunction arising out of AmeriData, which indicated you weren't to engage in false or misleading statements again? And then, in the Sanctuary Belize matter, you engaged in the very things that the AmeriData order and the injunction said you weren't to do. And I understand your argument under the Sanctuary Belize case and that the monetary judgment might run afoul of AMG, but I wonder if the contempt judgment is really quite different and a matter of the District Court enforcing its own judgments. And AMG did not affect, it affected monetary judgments, but AMG is very clear that it doesn't affect injunctive relief or equitable judgments. So, AMG may get you a certain distance in the Sanctuary Belize case. But I'm just the District Court's efforts to ensure the integrity of its own orders and to protect the sanctity of its own orders because there is something unattractive about you being subject to a judgment and a permanent injunction and then going right back and engaging the kind of misconduct that the permanent injunction forbids. Your Honor, I agree that the contempt order is not affected by AMG and we are not trying to relitigate the AMG final stipulated judgment, nor are we trying to in any way interfere with the Court's ability to protect the sanctity of its orders. However, the contempt citation in this case suffers from other defects, not the AMG defect. It suffers from the defect that, number one, it was based on a claim of violation which the District Court said first approved in 2005. Therefore, under 28 U.S.C. 2462, it's out of time. It's way beyond the five-year limitation prescribed by that statute. Also, in any contempt, if it's going to be a civil contempt, it has to be remedial. In this case, it couldn't be that the purpose was remedial in the sense of inducing the contemptors to comply with the judgment because it's a 2006 judgment. There's nothing left for them to comply with. It also couldn't be for compensation. Why wouldn't the $120 million judgment, why wouldn't the amount of that be justified in the sense that the violation of the permanent injunction in the Sanctuary Belize case caused the consumers, in the view of the District Court, which had conducted a bench trial, had caused consumers $120 million worth of damage? So, it was the violation of the injunction, which would not have been affected by AMG, was, as a result of the bench trial, it resulted in $120 million of damages to the consumers in that case. The monetary judgment may well fall on AMG, but I'm just wondering if the contempt judgment, which deals with not the merits of this or that, but simply District Court's enforcement powers predicated on a bench trial, I wonder why that wouldn't be left standing. Because, Your Honor, the District Court would have had to make specific findings about compensation and would have had to tie the amount to the violation of its order. In this case, the District Court, at page 165 of its opinion, specifically said that it found it unnecessary to determine the amount of compensation that any consumer might have suffered as a result of the contempt violation. So, the FTC put in no evidence concerning compensation and the District Court made no findings as to the amount, not for $120 million, not for anything. Why weren't the findings made by the District Court indicated that the consumers in the sanctuary believes fraud had suffered $120 million as a result of the violation of its injunction? Your Honor, I'll quote the District Court's own language. The District Court said, and I'm quoting, because any compensatory remedies to the TSR contempt would be duplicative of the restitution ordered for violations of the FTC Act and the present proceedings, the Court finds it unnecessary to determine the exact amount of compensation to be paid by Hoopi Baker and Usher for their contumacious conduct. So, the District Court specifically decided not to make any determination, not to make any findings on the amount of compensation that would be due as a result of its finding contempt. And so, there's nothing in the record to support an award of $120.2 million without contempt. And as I say, it's also out of time under 2462. If it's anything, it might be considered a penalty under that statute or it might be considered criminal contempt, in which case it would be, it can't stand because the appellants did not have a criminal trial. The contempt citation against Mr. Hoopi separately for $172 million also cannot stand. In that case, the FTC waited until the 15th day of the 17-day trial on sanctuary bullies to bring up out of the blue an alleged violation of the same stipulated final judgment in 2006 based on his alleged failure not to cooperate with the FTC because he pled guilty in 2010. That had absolutely nothing to do with sanctuary bullies. And Mr. Hoopi wanted to try to offer a response. The district court would not allow him to present any evidence or testimony in rebuttal and only allowed him to comment on a final argument. Similarly, the FTC put in no evidence to support their claim of this alleged non-cooperation, which had occurred, as I say, in 2010 had nothing to do with sanctuary bullies. So you want the $172 million judgment vacated as Yes, your honor. And in that case, that's the reasons which I just given. It was either a penalty, in which case it was way out of time, 2010 to 2018, way beyond 2462. It might have again also been conceived. I'm unsure of the basis of vacating the $172 million judgment. It seems to get back into the merits of the Ameridet case, which I'm not sure before us, but your client in this case, violated the terms of that order by repaying personal loans rather than by repaying the obvious remedy for violating the judgment is a reinstatement of the judgment. Because it was made clear to you when you consented that if you fail to cooperate with the FTC, the $172 million judgment would stand. I see my time is up. Well, you can have some rebuttal time. And if my panel has a question, I'll certainly defer. That question. Judge Keenan. All right. Well, let's question is, let's hear from the panel has no question. Let's hear from Mr. Messler. Thank you, Your Honor. And may it please the court. The two orders in this case, affirming two of the orders in this case, resolves most of the issues on appeal. Those orders are the contempt judgment, which has been discussed extensively, and then the default judgment against Mr. Usher and the corporate appellant together. Why don't you jump right into the question that opposing counsel raised, which is the $120 million figure that the district court settled upon was not supported by adequate findings? Sure, Your Honor. Joint Appendix 1017 to 1018 is the district court's order in which it says that the harm from the telemarketing contempt and the contempt here was a violation of the emeritus order, permanent prohibition on Mr. Plotkin and those acting in concert with him from engaging in deceptive telemarketing. Well, the district court found that, you know, and used with extensive findings that the appellants here did engage in deceptive telemarketing. So that was the violation. And the remedy for that, the harm, the district court said, is exactly the same. The harm is the harm to consumers. So that was the compensatory sanction that the district court entered as a result of the contempt of the Meredith order. So I had understood that your colleague on the other side continually sort of made the argument that you say that it's a hurt to consumers, but you didn't march consumers in at all. And so what do we know about these consumers? Sure. So I'll start with the assertion, which is throughout their brief that most of the consumers were satisfied. Well, there is simply no evidence in the record of that. Well, there was one of the consumers was a defense witness who said that. But other than that, the measure of consumer case like this depends on whether there were misrepresentations made that were material that were widely disseminated. And then there is a presumption that consumers relied on them. And so the presumption applies here because the district court made extensive findings about each of these misrepresentations, that each of them were material. So then it goes to the it's true there was this one there was this one defense witness, but there were also numerous witnesses from the FTC, including consumers, including reported calls, including webinars and other evidence that these that these claims were made that support the district court's determination that they were material and likely to likely to mislead consumers. But counsel, is there any place and I think this is what Judge Motz is getting at. Is there any place in this record that we can look to that actually provides a rationale for the amount of damages assessed in the contempt order? Well, yes, your honor. I think that would be in the section of the district court's order that discusses the that discusses all of this. There's first there's a section that lays out the legal standards, and then there is a section that is titled compensatory. That is entitled Monetary Relief. Now, it's. But don't you have problems because some people might qualify or the. Mr. Poop could assert a face to face exception with regard to some of these transactions. It seems to me it's not necessarily all or nothing. And and and you're suggesting that it is all or nothing. So I think it's it's probably good to clarify here which order that we're talking about. So there there is the what I'll call the 13B order, which held that the defendants violated section five of the FTC Act and the telemarketing sales rule and therefore were responsible for $120 million of monetary relief to remedy that. Separately, the contempt judgment is was made for a violation of the emeritus order, which is right, which was predicated, though, on the telemarketing sales rule violation, was it not? No, you're not at all. No. So the the order itself defines telemarketing and it prohibits the and it prohibits them from making deceptive. OK, so you don't think that that's part of the foundation then for the contempt finding? No, it's not. The face to face exception is specific to the TSR and not to the contempt. To what extent are you relying on the court's other aspect of the contempt finding that Mr. Poop paid his lawyer before retiring the judgment? So are you relying on that as well? I haven't heard you talk about that. So in comparison, we do think that order is correct. That was one hundred and forty eight thousand dollar compensatory sanction. So I'm not talking about it because it is a very small amount in comparison to the one hundred and twenty point two million in the in the other contempt judgment. So. So then I'd like to move to, if I may, the one other thing, what is the standard of review in your judgment of one hundred and twenty million dollar finding by the district court? Well, so on the contempt. Well, the so the the contempt order is reviewed for clear air, for factual findings and and, of course, abuse of discretion for the entry of the amount of the amount of compensatory sanction. And I don't think that the defendants have shown any abuse of discretion here. And I just like to point to one one of the district courts finding the one of the last deceptive claim in this case is that the defendants promised a robust resale market. And what the district court found through a lot of evidence was that there was no resale market. So the defendants say over and over that these properties were worth so much money that these consumers were not harmed. What the district court found, and they've shown no error in this, is that nobody was able to sell these properties. So whatever, you know, intrinsic value they might have had a a property that you have that you can't sell is worth nothing. So the injury to these consumers was the total price that they paid for a property they were not able to sell. That's even setting aside that they didn't get what they were promised. They were promised properties in a luxury resort with airports and hotels. And is it a matter of is it a matter of just pure coincidence that the 120 million contempt judgment matches precisely the 120 million of damages in the Sanctuary Belize case? I know, Your Honor, it's not a coincidence at all because it was the same conduct that violated the telemarketing sales rule that also violated the Ameridet final injunction. Well, you just said earlier, though, in response to my question, it was not predicated on telemarketing. It was the same. So was it or was it not? Well, the contempt is not predicated on a violation of the TSR. That is, it was predicated on telemarketing, wasn't it? That's correct. So they were both telemarketing. So you're drawing a distinction then between telemarketing and the violation of the TSR. Right. So the telemarketing violated both the Ameridet order and the telemarketing. Lawrence, tell me again, succinctly now, where you think the basis of the district court's findings were on the 120 million dollar contempt judgment? Just succinctly, what's the basis of it? So the basis is that these misrepresentations were made. There is a presumption of reliance that was not rebutted. And the measure of damages in that case is the total price that the consumers paid. And that applies. And then the district court found, again, J 1017 to 1018, that the harm from the telemarketing contempt was the very same harm from the violations of Section 5 of the FTC Act. So between those two findings, I believe, is how you find that the measure of damages for contempt. Can you explain that there are two, that the amount is not the same? In other words, you're not talking about 240 million? No, Your Honor. And the district court said this directly. I just wanted to have you tell me that too. Of course. I'd like to turn to the contempt judgment. I mean, sorry, the default judgment. Because the contempt covers the individual defendants here. But the default covers the corporate appellants and then is a second basis to affirm the amount of monetary relief for Mr. Usher. Before you do that, remember there is a question about goods and services. OK. And I guess that goes to both now, that you both are related to each other. So you want to tell me what the goods and services are? Sure. So as the cases that are cited in our brief show, even if real estate is not considered a good in service, this is not a case that involved just plots of land. The consumers in this case were sold and sanctuary police promised them properties in a luxury resort that necessarily included services. For example, in order to have a home in this development, they would need roads to access. And those roads needed to be built. They needed water. They needed electricity. They needed sewer service. All of those were included in what they were purchasing. Those things were not built. Wasn't there also merchandising? Advertisements for these goods and services? I mean, that would constitute service anyway. Well, they certainly promised the many amenities which the district court found were not provided. But isn't it goods and services in connection with? That's correct. That's correct. So the language of the district of the Meredith border is misrepresentations in connection with telemarketing of goods and services. So yes, they made these misrepresentations. And they were in telemarketing. And the product that they were offering went beyond land and necessarily included. So what is the purpose of financing? I'm sorry. Excuse me, Judge Wilkinson. You go ahead, Judge Keenan. What about the offers of financing that accompanied the telemarketing? Could you address that? How that plays into your statutory analysis? Yes. Well, again, like still talking about the contempt rather than the telemarketing sales rule rather than statutory analysis. But yes, I agree. No, I'm sorry. I'm sorry. Perhaps I'm not being fair. I'm talking about the telemarketing sales rule. And the extent to which the financing would play in. To the goods and services argument? As opposed to just offering certain future amenities down the line. Was the financing part of the problem as well? Yes. The extent that they're offering financing, that certainly is clearly a service which when bundled with the sale of land would qualify and take them out of that exception. To the extent the court wants to address it, as we mentioned in our brief, that this was not, they never brought up goods and services with regard to the telemarketing sales rule specifically. The reply brief does cite one sort of early on filing by Mr. Pucky that mentions like in one sentence something about goods and services. But that actually refers to the contempt and not to the TSR. I think what concerns me at the core of this case is that there was an Ameridad order and an injunction saying do not engage in false and misleading statements. And they went right back and in violation of that injunction they engaged in the kind of false and misleading statements that the injunction forbid. And the district court held a bench trial as to that. I was familiar with the case and I do think the nature of the defendant's repetitive misconduct plus the district court's bench trial is due some deference. This is at the heart of what the FTC is supposed to be doing, which is cleaning up this kind of fraudulent abuse of consumers. The one thing that I want to make your position, I'm uncertain as to what your position is. I don't think much of your section 19 argument, I must say, because you didn't plead it. And section 19 has a number of procedural hurdles which you didn't clear. But one thing I wonder, are you really trying to uphold a monetary award in the sanctioned Belize case? Because it seems to me if you can't switch it over to section 19 that the monetary award in the sanctuary Belize case is very likely invalid under AMG. And wouldn't you agree with me that this doesn't affect large portions of your case? They're not affected by that. But the monetary award in the sanctuary Belize case would be affected by AMG, would it not? Yes, your honor. I think the monetary award, I'm going to call that the 13B judgment. Yes, that would definitely be affected by AMG. But our argument today is that the same harm is addressed by the sanction for contempt. Yes, and I understand that because AMG did not impair the district court's equitable powers. And it wouldn't have impaired the district court's ability to see to the integrity and enforcement of its own order where the defendants in this case had repeatedly engaged in conduct in defiance of the permanent injunction. But I look at the monetary judgment as one thing. I think if I look at the injunction and the violation of the injunction and the attempt of the court to enforce its own orders, I see that as a separate and distinct matter which was not impaired by AMG. And I'm wondering if I'm correct in that, aren't you reaching farther than you need to reach in trying to uphold $120 million in the sanctuary beliefs case, the monetary judgment? That's a straight 13 judgment, section 13 judgment. I don't see how I can stand. And aren't you overreaching in trying to get that upheld? So, your honor, our argument in the first few pages of our brief is that you do not need to reach that judgment. And I see my time has expired. But what I'm saying today is the same thing. You say it's overreaching, and I'm saying it is beyond what the court needs to decide. Those are the arguments that we make. We think they're correct. But here today, our argument is you can affirm these judgments based on the contempt and the default judgment. And you do not need to even reach those issues or decide if they're right or wrong because the harm is exactly the same. How do you affirm as to the defaulting parties when you have the AMG problem? And it seems to me you're trying to reach the defaulting party. Are you trying to reach them through the contempt group? Or are you trying to use the section 19 to bootstrap reaching the defaulting parties? Neither one, Judge Keenan. The defaults are in a different procedural posture. Right. I mean, under Rule 54C, you can't change your theory of the case against them, right? That's right. Right. So, you can't use section 19 against them. No, and we are not suggesting that the court should. Our argument under the default judgments is Rule 55 handles default and default judgment. And what it instructs is you can get relief from a default for good cause. You can get relief from a final default judgment only for the grounds of under 60B. And in this case, they never saw it. They could have. They could have appeared and sought relief from the default or default judgment. Well, they did say that they did file a motion in the district court. Did they not to set aside the default judgment? To set aside the final default judgment under Rule 60B. Yes, correct. They cited Rule 60B-5, and they didn't really provide any argument as to why they thought that applied. But the grounds under Rule 60B-5 are generally for judgments that have been either overturned or satisfied. Those don't apply. The only one that could possibly be applied is that the judgment is no longer equitable to apply the judgment respectively. And as we say in our brief, the courts uniformly agree that a monetary judgment that is entered to in response to a past harm is not the sort of perspective judgment that falls under Rule 60B-5. So the only argument that they have alive with regard to the default is that one, and it fails under the weight of all of the case law. But you're saying that's a separate and distinct issue from the other things that we've been discussing, that that's just separate and involves a different set of considerations, whether they, you know, showed or whether it was legitimate for pro se defendants to approach, say, lawyers to represent the corporation. And of course, the default judgment was only entered against the corporation and usher. So it concerned a much smaller universe of people than the other judgment. It just didn't, I think it just involves a different playing field. I agree, Your Honor, and I should just address for, if I may, the allegation that they were trying to represent these companies. As a factual matter, that is only at odds with how they litigated this case. From the beginning, it was to these defendants advantage to distance themselves from these companies. And that's because our standard, the commission standard that we had to meet to prove their individual liability, depended on their ownership or control of these corporations. So if they are directing the litigation on behalf of these companies, that is inconsistent with their position that they didn't own, that they didn't control these companies. And I'll just give you one example. Mr. Baker repeatedly denied that he owned these companies and claimed that his signature on their founding documents was forged. And you can see an extensive discussion of this at the Joint Appendix, page 930, where the district court, you know, emphatically rejected. Well, you can't have non-lawyers representing the corporation. Of course not. And that's one of the things they tried to do. And that's just impermissible. Right. So the idea that they wish they could have had these companies represented is inconsistent with how they. All right. Well, let's, if the panel has further questions, that's fine. Otherwise, I think Mr. Corris has five minutes. Thank you, Your Honor. May it please the court. My name is Gary Corris. I'm with the firm of Barnes and Thornburg, and I represent the successor receiver, Mark Philip Fersan of Ankara Consulting Group, LLC. I'd like to address two issues pertinent to the receivership. The appellants first contend that because the AMG case precludes the use of Section 13B for equitable monetary relief, that the court must vacate the orders establishing the receivership. And they cite an 11th Circuit decision, FTC versus On Point Capital Partners, in support of that result. The appellants misconstrue AMG, and they ignore critical distinctions in the On Point Capital Partners case. And in fact, On Point Capital Partners goes against numerous other cases that have been decided post-AMG. First of all, AMG specifically acknowledged that Section 13B permits the commission to obtain preliminary and permanent injunctive relief. And unlike On Point Capital, numerous cases after AMG hold that injunctive relief can be imposed even if monetary remedies are unavailable. And AMG does not suggest that the equitable remedy of receivership is unavailable when under Section 13B. In fact, AMG never said one word about the equitable remedy of receiverships. And in fact, it's been consistently held throughout the years that receivership is a proper ancillary equitable remedy as an adjunct to injunctive relief, and AMG does not provide otherwise. There's also a critical distinction with the On Point Capital Partners case. It arose in the context of a prejudgment preliminary injunction. We've heard a lot of discussion today about our case in which the FTC has demonstrated that there are multiple monetary judgments that should remain effective that are not based on Section 13B, most specifically the $120 million contempt judgment as to Pucky, Baker, and Usher, as well as the $120 million default judgment against all the receivership entities who did not settle and John Usher. And there are also numerous stipulated judgments in this case which preserved the receivership and are unaffected by the appeal, no less than six of those judgments, including most recently after the briefing was complete in the case before this Court, Luke Chadwick and all his companies settled and has given up his beliefs, interests, and assets. So this is a completely different situation than was facing the Court in On Point Capital. The second thing I'd like to discuss is that the appellants assert that the receiver was only appointed to use defendants' assets to satisfy equitable monetary relief. This is simply wrong. The Court found at the outset of the case in connection with the temporary restraining order, thereafter at the preliminary injunction phase, and thereafter at the final judgment phase, that immediate and irreparable harm would result from defendants' ongoing violations of the FTC Act and the telemarketing sales rule unless the defendants were enjoined. That finding is without reference to monetary relief. And indeed, in each of those orders, the TRO, the preliminary injunction, and multiple final judgments, there are receivership provisions unrelated to asset preservation and instead are geared to preventing ongoing consumer harm. There's a section that empowers the receiver to remove the officers and directors from control and management of the receivership entities. There's a section that requires the receiver to suspend operations of the receivership entities if, in the receiver's judgment, they can't be operated legally. And there's also a directive to protect the interests of consumers. All of those provisions are unrelated to gathering assets. And instead, they're geared to preventing continued consumer harm. The appellants, in fact, specifically asked the Court to, quote, vacate all directives issued by the receiver regarding sanctuary beliefs, close quote. Those directives were undertaken by the receiver to prevent ongoing continued consumer fraud. These include the receiver's instructions for the consumers not to pay under the fraudulently induced contracts. And it also includes the receiver's removal of the board of directors of one of the receivership entities, City River Wildlife Reserve. Those numbers were appointed by the defendants as part of the wrongdoing in this case. And in fact, this is very similar to the case that came down post-AMG Federal Trade Commission versus Nolan out of the District of Arizona, which we did not cite in our brief. It was entered late last year. And the Court found that AMG did not undermine the receivership component of a preliminary injunction order, where one of the key reasons for receivership was- All right. Thank you. Thank you, counsel. Thank you very much. Thank you very much. Mr. Koslow, you have some rebuttal time. Thank you, Your Honor. First, as to the default judgment on page 1022 of the Joint Appendix, the District Court based the monetary portion of the default judgment specifically on Section 13B. So that is knocked out by AMG, cannot be supported in light of the Supreme Court's decision. Second, Judge Keeton repeatedly asked counsel for the FTC to identify on the record where there's evidence to support a showing by the FTC of the amount of compensation awarded by the District Court. There is none. There's nothing in this record because the FTC did not put any evidence into the record concerning the amount of compensation. Counsel, let me just say this. You've thrown up a lot of different issues. I don't know. There may be 20 or what have you. But to me, the core of this case was that you were under a judgment for false and misleading statements. And then in defiance of the court's injunction, you went back and committed a number of very stark and blatant false and misleading statements once more. And again, although there's been controversy about the FTC's role, this rights belongs right at the center of it. And you say, well, the District Court didn't make findings on $120 million. Well, what should the District Court have done? For example, the consumers are in very different situations. It's not a one-size-fit-all business. Some of the consumers inspected their property. Others of the consumers did not. Some of the properties were worth more than others. It doesn't seem to me realistic to expect the District Court to go consumer by consumer by consumer, drag them all in, see which circumstances are the same and which circumstances differ. That's asking a lot. And the District Court did hold a bench trial here, made extensive findings about the numerous repeated misrepresentations that were made and came up with a figure that would approximate the damage that these representations caused. And I can't see sending it back producing any different result, particularly when the District Court is much more familiar with the damages imposed or the monetary loss imposed. But the point is, repeatedly, you've tried to defraud consumers. And then you come up here and you want to get away with it. And I'm having trouble with that. Your Honor, the first thing the District Court could have done was to release some funds that were frozen to allow these appellants to be represented by lawyers. That was an arbitrary and abusive discretion. The FTC relies on FTC versus worldwide funds. In that case, the District Court allowed funds to be released from frozen assets. What it did do was it put a $90 or $40 per attorney cap on the amount that it was allowing. The Ninth Circuit reversed that decision by the District Court and said there was no basis to put a cap on the amount of money that could be released from frozen assets to pay for counsel. And it sent it back to the District Court and said there should be no cap at all. If there is going to be any kind of restriction, the District Court should hold some sort of hearing and have a finding as to how much money had to be kept frozen and how much could be released for hiring counsel. The District Court, in this case, did no such thing. It simply did not give a penny to these appellants represented by counsel. The entire trial and all the findings are based on an unfair trial. Then I've misread the record here. I thought there was a small amount at the beginning given to counsel. That's an error. If I find it in the Joint Appendix that the District Court did do that, that I'm misreading what it said. The District Court gave $5,000 for living expenses and the District Court made a one-time allocation to some of the appellants of $30,000. But that was for travel and for consultation, not for hiring lawyers. The lawyer's bills for one of the lawyers was $136,000. The District Court denied any release of money for that. That was just for one attorney and for one part of the case. None of the other appellants were allowed to have counsel. The entire trial was conducted with... But you were here, right? And you're a lawyer, right? So there are lawyers willing to represent these people, right? There were none at the District Court. There were no lawyers? There were at some point. At some point, there were lawyers. At the very beginning, they had money from their parents or their sister. But once the trial came underway, there were no lawyers representing them. They were acting pro se throughout the entire trial. So we, when we go back and look at this massive record, we're going to see that for a large part of it, the District Judge, the experienced District Judge, prevented you from having from your clients from having any lawyers. The District Judge refused to release any frozen funds for the appellants to hire counsel. Yes. No, no, no. That wasn't the question I asked you. But let's not do that. Judge Keenan, do you have any further questions? No. Can you hear me, Judge Keenan? Do you have any further questions? No, thank you. All right. Thank you very much, counsel. We appreciate it. And we will move into our second case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Barbara Milano Keenan